## Ward v. Qualls et al.

(Decided May 24, 1929.)

MANN & VINCENT and HAGER, PRICHARD & MALIN for appellant.

A. N. CISCO for appellees.

Opinion of the Court by Drury, Commissioner— Reversing.

On October 17, 1925, M. A. Qualls contracted to build a house for T. A. Ward, and Milton Rayburn became surety for Qualls upon his bond for $5,000 that this house should be built according to certain plans and specifications, which were attached to the contract and the bond. On November 9, 1926, Ward sued upon this bond and sought to recover $5,000. When the matter was heard, it resulted in the plaintiff's petition being dismissed and in Qualls recovering a judgment against Ward for $296.01, and Ward has appealed.

It is admitted that Qualls built for Ward a house, but it is Ward's contention that Qualls did not build this house according to plans and specifications. Ward says that the concrete walls in the basement were not carried up to the grade line as the contract provided, but were stopped about 18 inches below the grade line and finished out with brick; that as a result water seeps into the basement. He says that the concrete work in this basement was so put in that it is porous, and water seeps through it; that as a result the basement floor is wet. Ward showed by a tenant of his that at one time water gathered in this basement in such quantities that the tenant had to put on hip boots and go down and turn off the gas heaters because the water had got up to them, putting them out; that the basement floor is continuously wet; that the roof leaks; that there is a leak in the bathroom, the front and back bedrooms, and on the back porch; that the stone sills of the windows did not have the proper slant, and as a result of that rain beats in at those places; that the paint work was defective; the floors have drawn away from the baseboard; that the stairway was improperly constructed; that it was pulling away from the walls; that the hardware used was of an

inferior kind; that the plastering is badly cracked and some of it has fallen; that the windows were not properly installed, so that some of them were tight and others rattled; that by the contract this was to be a 7-foot basement, whereas it is now about 6 feet 3 inches. Numerous other matters were complained of. The law applicable to such a situation is well stated in Hoskins v. Williamson et al., 228 Ky. 395, 15 S. W. (2d) 242: "It is earnestly insisted that the commissioner and the court proceeded upon an improper basis; that the measure of damages in such a case is the difference between the fair market value of the building as constructed, and its value if constructed according to the contract. This is the ordinary measure of damages in such cases; but if the defects are such as may be remedied at a reasonable cost, and the building would then be in as good condition as if these defects had not existed, the reasonable cost of correcting the trouble is in fact all the damages that the property owner has sustained." Also see Anglin v. Simpson's Adm'r, 220 Ky. 562, 295 S. W. 868, and cases there cited.

A great deal of proof has been taken, but there is little proof that is directed to the measure of damages as outlined above. Qualls introduced a great deal of proof about what this house was worth, but the value of that proof is lessened by the fact that there is no evidence to show how much of this estimate refers to the value of the house and how much to the value of the lot. Of course, the value of this house was a rather important question, but another very important question was what would have been the value of this house if it had been built according to the plans and specifications. Ward was entitled to recover the difference between the value of the house he got and the house he should have had. If Qualls had proven this house to be worth $8,000 and Ward had proven it would be worth $10,000 if built according to the contract, Ward would be entitled to recover $2,000 from Qualls, although he was only to pay Qualls $5,275 for the house. In other words, Ward was entitled to his bargain. If Qualls undertook to build this house for too little money, that was his bad fortune and Ward's good fortune. One witness places the difference between the value of the house as built and as it should have been built at $2,000. Ward says that, to make this house comply with the plans and specification, it will be necessary

to tear the house down and rebuild it, and that it could not be put into the condition called for in the plans and specifications for less than $5,000. Mr. Willett, an architect, was asked the difference between the value of the house as built and its value if built according to the plans and specifications, and he said the difference would be the contract price of the house plus whatever it would take to remove it in order to start over again. The architect Eckman, asked to put a value upon this house in its present condition, said it had no value, and then added: "It is worth something; but, if I would try to sell it to a man, he would never give me anything for it." That is about all the evidence directly on that question.

Ward insists that it is necessary to tear this house down and rebuild it in order to make it comply with the contract, which, of course is unreasonable. The difference in the height of the basement grew out of the fact that Qualls built the house before he made the sewer connection, and when he made it he found that it was necessary to raise the bottom of the basement about 9 inches in order to secure drainage. This much is admitted, but Qualls introduces a number of witnesses to show that the house was well built; that the roof did not leak and the window sills were properly placed, etc. However, we are impressed by the evidence of the tenants who lived in the house, for, if there is anything that is calculated to make an impression on a woman's mind, it is for the clothesline to break, the stovepipe to fall down, or the roof to leak, and we are quite sure that one who has lived in a house is in a better position to say whether the roof leaks or not than one who just goes through and makes an examination of it. A reading of this record shows Qualls scamped the work on this building. As one witness expresses it, "It was a botched job." After he had completed the stairway, he had to take it down and rebuild it. He had to take down the porch ceiling, and put it up again. He repainted the interior, and it seems he has been patching on it almost continuously from the time he said he was through with it until this suit was brought. The shingles were to be creodipt, and one of his painters admits that there were places where they were not, and it was necessary to paint over such places to give it a good appearance. He had to repaint the interior, as we stated, and this painter, when asked why that was necessary, said: "I was called on to go out there and straighten up

the job. It was not a first-class job." Daniels, the contractor who puts in the sewer, says he never saw the plans or specifications. The painter says the same; so does the plasterer, and so does Griffin, the man who did the repainting.

From this record we are persuaded that, while this house is perhaps not entirely according to the plans and specifications, yet it is almost so, except as regards the basement and the leaks, and some other minor matters. We believe that $500 would be sufficient to remedy those matters. That will be sufficient to discharge the judgment for $296.01 recovered by Qualls and to entitle Ward to a judgment against Qualls and his surety for $203.99.

The judgment is reversed, with directions to enter a judgment as indicated.