BUSH BUILDING COMPANY, Plaintiff,

v.

CITY OF BARBOURVILLE, KENTUCKY, Defendant and Third Party Plaintiff,

ALFRED LE FEBER & ASSOCIATES, Third Party Defendant.

No. 725.

United States District Court
E. D. Kentucky.

Oct. 9, 1957.

Howard F. Butler, Miles, Butler, Cor-
bitt & McCall, Carmack Cochran, Martin
& Cochran, Nashville, Tenn., James

Park, John L. Davis, Stoll, Keenon & Park, Lexington, Ky., for plaintiff.

Charles G. Cole, Barbourville, Ky., J. Milton Luker, London, Ky., Earl S. Wilson, Bullitt, Dawson & Tarrant, Louisville, Ky., for defendant.

Paul W. Steer, Steer, Straus & Adair, Cincinnati, Ohio, for third party defendant.

HIRAM CHURCH FORD, Chief Judge.

On May 19, 1950, the City of Barbourville, Kentucky, hereinafter referred to as "City", entered into a contract with a firm of civil engineers of Cincinnati, Ohio, doing business as a partnership under the firm name of Alfred LeFeber & Associates, which consisted of Alfred LeFeber, as principal, and Howard J. Kern and Horace H. Mace, as associates, hereinafter referred to as "LeFeber", to prepare the necessary plans, specifications and cost estimates of a coordinated program for water and sewerage improvements for the City, to receive and tabulate proposals and to assist the City in awarding construction contracts and to furnish general supervision of construction and all professional engineering services required to protect the City's interest.

Pursuant to the contract, LeFeber prepared plans and specifications for the fulfillment of the coordinated program setting out in detail the specific plans, specifications and requirements for the construction of water mains, water storage reservoir, water treatment plant, sewers and pumping stations and a sewage treatment plant, together with numerous general provisions covering the program, all of which, with the construction contract, are bound in one volume filed in the record.

On August 13, 1952, the plaintiff Bush Building Company, a Tennessee corporation, hereinafter referred to as "Contractor", entered into a single contract with the City, by the terms of which the Contractor covenanted and agreed, in consideration of the payment specified, to furnish at its own cost and expense all labor and materials necessary to complete the construction as provided by the plans, specifications and general provisions prepared by LeFeber. The different improvements embraced in the program are described as Contracts Nos. 1, 2, 3, 4 and 5, with further provisions showing the parties intended the improvement program to be completed ready for operation and use "as a whole".

In the fall of 1952, the Contractor entered upon the performance of the work.

On May 6, 1954, plaintiff Contractor filed its original Complaint alleging full and complete construction of the water mains, storage reservoir, water treatment plant and sewage treatment plant, referred to as Contracts Nos. 1, 2, 3 and 5, respectively, and alleging final approval and acceptance thereof by the resident engineer and consulting engineer assigned to the work. This original Complaint did not claim completion of the sewers and pump stations. After having amended the original Complaint, plaintiff, on November 9, 1954, filed its Substituted Complaint in the place and stead of its original Complaint as amended, by which it alleged full and complete performance of all the improvements in strict conformity with the provisions of the contract documents; that the necessary prerequisite to final payment in the form of Engineer's certificates of final acceptance and approval had been complied with; that the decision of the Engineer in these matters is final and binding upon the parties; that there was a balance due and payable to plaintiff in the sum of $60,949.05, exclusive of the amount retained by the City as a guaranty. It further claimed that the City was indebted to it in the additional sum of $4,143.82 for work and labor done in addition to that required under the contract documents, and it sought judgment for the total sum of $65,092.87.

On October 3, 1955, plaintiff filed its final Supplemental and Amended Complaint alleging that on September 7 and September 13, 1955, LeFeber directed plaintiff to perform certain work in re-

spect to the contracts referred to in its substituted Complaint in order for plaintiff to be entitled to the payment of the 5% guaranty fund provided for in the contract documents, and that on September 15, 1955, the defendant wrongfully prevented the plaintiff from performing such work which it was ready and willing to perform, and reiterated and reaffirmed all the allegations of its substituted Complaint and asserted the right to receive the additional balance retained by the City under the guaranty provisions of the contract and sought judgment for the total sum of $98,797.77.

By Answers, as amended and supplemented, the defendant put in issue all the material allegations of the plaintiff's pleadings, and filed its counterclaim against the plaintiff for damages in the sum of $500,000 on account of alleged failure of plaintiff to perform its agreements. Defendant also filed a Third Party Complaint against LeFeber asserting that if it be determined that LeFeber had executed the final certificates evidencing final completion and acceptance of full and complete performance of the contracts by the plaintiff and by reason thereof plaintiff was entitled to recover judgment against the defendant, and the counterclaim of the defendant was denied, LeFeber was liable to the City for damages in the sum of $500,000 by reason of fraud, negligence and fraudulent collusion in executing such certificates of final approval and acceptance, and defendant sought judgment against LeFeber for such damages. LeFeber filed Answer putting in issue the allegations of the Third Party Complaint.

Upon the evidence presented at the trial, which began on October 3, 1955, and concluded on February 10, 1956, the Court's Findings of Fact and Conclusions of Law are hereinafter stated.

The total amount agreed to be paid for all improvements covered by the contract was the sum of $694,098.09 allocated to the several improvements as follows:

| | |
|---|---:|
| Contract No. 1—Water Mains | $ 94,259.98 |
| Contract No. 2—Storage Reservoir | 32,244.40 |
| Contract No. 3—Water Treatment Plant | 159,668.49 |
| Contract No. 4—Sewers and Pumping Stations | 312,458.87 |
| Contract No. 5—Sewage Treatment Plant | 95,448.35 |

Prior to the institution of the action, upon monthly estimates made by the Engineer, the City had paid plaintiff $598,444.14 leaving an unpaid balance of $95,653.95 including $34,704.90, the amount retained by the City under the guaranty provision of the contract.

The provisions of the contract which seem pertinent in considering the problems presented are as follows:

"General Provisions

"1.  *Definitions:*

\*     \*     \*     \*     \*     \*

"Wherever the word 'Engineer' occurs herein it shall be taken to mean Alfred LeFeber, Consulting Engineer, or a duly accredited representative thereof. (P. 25)

\*     \*     \*     \*     \*     \*

"3.  *Engineer's Duties and Authority:*

The Engineer shall have authority to appoint such assistants and inspectors as may be necessary to represent him in his absence from the work; they shall keep the Engineer informed as to the progress of the work, the character of the materials furnished and the manner in which the work is being done; they shall call the attention of the Contractor to any infringement upon the plans or specifications; they shall have authority to reject defective materials and to suspend any work which is being improperly

done, subject to the final decision of the Engineer. Neither the Engineer nor his assistants are authorized to revoke, alter, enlarge or relax the provisions of these specifications. (P. 25)

\* \* \* \* \* \*

"The Engineer shall in all cases determine the amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for under this contract; *and shall in all cases, decide every question which may arise relative to the fulfillment of this contract on the part of the Contractor. In so doing to prevent disputes and litigation, he shall render fair and impartial decisions, and such decisions shall be binding upon the parties hereto.* The Engineer shall prepare all estimates of materials furnished and work done upon which the Contractor is to be paid, which estimate shall be final and conclusive except as herein otherwise provided, and such an estimate or estimates shall be a condition precedent to the right of the Contractor to receive any money under this contract. (Emphasis added. P. 26)

\* \* \* \* \* \*

"If at any time before the commencement of or during the progress of the work, the Engineer is of the opinion that the materials or appliances used or to be used are insufficient for securing the quality of work required or the required rate of progress, he may order the Contractor to increase their quantity or efficiency and improve their character, and the Contractor shall conform to such order; *but the failure of the Engineer to give such order shall not be so construed as to release the Contractor from his obligations to secure the quality of work or the rate of progress required.* (Emphasis added. P. 26)

\* \* \* \* \* \*

"11. *Inspection:*

\* \* \* \* \* \*

The inspection and supervision of the work and materials by the Engineer, his assistants or inspectors is intended to aid the Contractor in accomplishing the fulfillment of his duties and obligations under the Contract, *but such inspection and supervision shall not relieve the Contractor from his contract obligations.*

"*Defective work shall be made good and unsuitable materials may be rejected, notwithstanding that such work and materials have been previously overlooked by the Engineer and accepted or estimated for payment.* If the work or any part thereof is found at any time before the acceptance of the whole work to be defective or to contain defective materials, the Contractor shall make good such defects under the direction of the Engineer. (Emphasis added. P. 29)

\* \* \* \* \* \*

"24. *Guaranty and Maintenance of Work:*

The Contractor, for the work herein specified, in consideration of the prices bid and to be received therefor, guarantees that the workmanship and materials furnished under the specifications and used in said work are first-class in all respects, and are of such kind, quality and amount, that for a period of one year after the completion and final acceptance thereof by the owner the work shall require no repairs or renewals on account of defects in workmanship or materials.

"There shall be retained by the owner from the amount due upon the contract, a deferred payment in an amount equal to five per cent of the total final contract price of the improvement, which amount will be retained for one year after the completion of and final acceptance of the improvement as a guaranty upon the part of the Contractor that the workmanship and materials furnished therefor are first class and as above provided, and that the improvement is and will remain in good and sound condition for and during the one year period from and after its completion and acceptance.

"In case the Contractor shall make or cause to be made at his own expense, any and all repairs and renewals which may become necessary under and by virtue of this contract guaranty, and shall leave

said improvement in good and sound condition satisfactory to the owner and Engineer at the expiration of the guaranty period, then, at the expiration of such period, the amount retained as a guaranty, plus all accrued interest thereon and less any and all necessary expense which may have been incurred by the owner in connection with the maintenance of the improvement and restoration of roads and streets, shall be paid to the Contractor as full payment for any balance due under this contract for said improvement.

"If during the said guaranty period, the improvement shall in the opinion of the Engineer or the owner, require any repairs or renewals which in his or its judgment are necessitated by reason of settlement of foundation, structure or backfill, or other defective workmanship or materials, the Contractor shall forthwith upon notification by the Engineer or the owner of the necessity for such repairs or renewals, make such repairs or renewals at his own cost and expense. Should the Contractor fail to make such repairs or renewals within a reasonable time after notification as hereinbefore provided, or to start such work within one week after such notification, the owner may cause such work to be done, either by contract or otherwise, and the entire cost and expense thereof shall be paid and deducted from the amount retained as a guaranty. Should such cost and expense exceed the amount retained or remaining in the guaranty fund, the Contractor or his sureties shall pay the amount of such excess to the owner. (Pp. 34–35)

"25. *Completion or Abandonment of Work:*

If the work to be done under this contract shall be abandoned by the Contractor, or if this contract or any part thereof shall be assigned or the work sublet by him without the previous written consent of the owner, or if at any time any employee of the owner shall become directly or indirectly interested in this contract or in furnishing the supplies or performing the work thereunder, or in any portion of the profit thereof; or if at any time the Contractor shall become insolvent or bankrupt, or if at any time the owner shall be of the opinion that the performance of the contract is unnecessarily or unreasonably delayed, or that the Contractor is wilfully violating any of the provisions of this contract; or if the work be not fully completed within the time named in this contract; then and in any such case the owner may notify the Contractor to discontinue the work or such part thereof as may be designated and the owner may thereupon, according to law, enter upon and take possession of the work or part thereof, complete, or cause the same to be completed, and charge the entire expense of so completing the work or part thereof to the Contractor; and for such completion the owner for itself or for its contractors may take possession of and use or cause to be used any materials, machinery, or tools of every description provided by the Contractor for the purpose of his work, and may procure or cause to be procured other materials, machinery or tools for the completion of the work, and the cost and expense thereof charged to the Contractor.

"All expenses, including those of reletting, incurred and charged under these clauses, or by virtue of this contract, shall be deducted and paid by the owner out of any moneys then due or to become due the Contractor under and by virtue of this contract or any part thereof. In case such expense shall exceed the amount which would have been payable under the contract if the same had been completed by the Contractor, the Contractor or his sureties shall pay the amount of such excess to the owner; but should such expense be less than the amount payable under this contract had the same been completed by the contractor, he shall receive the difference, after deducting the amount retained as hereinafter specified, but shall not be entitled to damages for not being allowed to complete the work himself. (P. 35)

\*　　\*　　\*　　\*　　\*　　\*

*"The approval of the final estimate for the work by the owner shall constitute the acceptance of the completed work.* (Emphasis added. P. 36)

"26. *Payments:*

\* \* \* \* \* \*

"If the Contractor proceeds satisfactorily with the work under this contract and complies with all the terms and conditions thereof, estimates of the work completed shall be made by the Engineer on or about the last day of each month, and submitted to the owner for approval. If approved by said owner, the owner shall, upon expiration of five (5) days thereafter, pay to the Contractor ninety (90) per cent of the total cost at contract rates for the work thus estimated, less any and all amounts so paid previously. Such payments shall not operate as an acceptance of the work done, and no work shall be accepted until all of the work contracted for is fully completed, or as otherwise provided in this contract. After all of the work has been completed and accepted, ninety-five (95) per cent of the value, at contract rates, of the amount of the work shown by the Engineer's final estimate, less the amounts already paid, shall be paid to the Contractor, and the remaining five (5) per cent shall be retained as a guaranty fund and disposed of as hereinbefore provided. All prior partial estimates and payments shall be subject to correction in the final estimate. (P. 36)

\* \* \* \* \* \*

"28. *Measurements:*

\* \* \* \* \* \*

"The measurements of the Engineer as to the amount of work done shall be final and conclusive. (P. 37)

\* \* \* \* \* \*

"31. *Restoration of Streets and Premises:*

"The Contractor shall at once upon completion of the installation of the water main or other structures in any street, road or field, restore the surface thereof in such manner as to make it safe and convenient for travel and to the satisfaction of the Engineer. In case such traveled road is unpaved, the Contractor shall thereafter maintain such street, road or way in a safe and passable condition until the completion and acceptance of the improvement and until the expiration of one (1) year thereafter.

"Should the Contractor fail to restore the various streets and roadways to safe and passable condition within 30 days after the completion of construction of the structures built under this improvement, the owner may authorize such work done in any manner they may deem expedient and deduct the cost thereof either from the final estimate or from the five (5%) per cent guaranty fund.

"Just prior to the expiration of the one (1) year guaranty period, the Contractor shall restore all unpaved roadway and streets covered by this improvement at least as good condition as those existing on such roadways or streets before they were disturbed by the Contractor's operations; he shall remove any surplus and supply any deficiency of backfilling materials, shall grade, smooth up and crown such streets and clean out and grade the gutters so as to give proper drainage; in case any street or roadway was gravelled or otherwise improved, the Contractor shall replace similar materials to the satisfaction of the Engineer. In no event shall cinders be used as backfill. The owner may cause any such work to be done, if the Contractor has failed to do it, upon expiration of the (1) year guaranty period, holding the five (5%) per cent guaranty fund until such work is done and paying the cost thereof from said guaranty fund. (Pp. 37–38)"

In the Contract under the heading "Work Covered", referring to the duty of the Contractor to check all work drawings and schedules supplied by the Engineer, it is provided:

"\* \* \* He shall not take any advantage of any such error, omission or discrepancy to avoid building and furnishing *a complete and unified plant.*" (Emphasis added)

And the next following paragraph contains the provision that,

> "All parts of the proposed plant and equipment shall be completed and placed ready for operation or use, *in their proper relation to each other and to the plant as a whole* * * *. *Before final acceptance, the project as a whole shall be tested and any necessary corrections made to assure that all parts are harmoniously related, coordinated and joined.*" (Emphasis added. P. 39)

> "*Excavation*
>
> " * * * *Trenches must be kept free from water during the laying of pipe, conduits, and the placing of concrete or other masonry.*" (Emphasis added. P. 41)

### Laying of Sewer Pipe

On page 96 of the Contract there is a special provision in respect to the laying of vitrified clay sewer pipe requiring that it shall be laid "in strict accordance with Recommended Practice for Laying Sewer Pipe of the A. S. T. M. (American Society for Testing Materials), Designation C–12–19". This document and also A.S.T.M. Designation C–12–51T, a later recommended practice on the same subject, are copied in the Reporter's transcript Vol. XII, pages 1403–1418. For present purposes, it is sufficient to note that they contain substantially the same requirements in respect to keeping the trenches free from water during the laying of the pipe. They also contain the provisions for securing the foundation of the pipe where the natural foundation at the bottom of the trench is not secure.

During the progress of the work, James W. Newman, served as Resident Engineer. He was paid by the City but was under the direction of LeFeber. His employment was terminated by the City on February 12, 1954. He did not testify at the trial of the case. He was succeeded by Clyde P. Mason. Hugh A. Graff, an engineer employed by LeFeber but not a member of the firm, served as Consulting Engineer in Charge, and Parker Hemphill and Robert Ohler, who were not engineers but both of whom had had considerable experience in construction work of the kind here involved, served as Inspectors.

The first question for determination is whether the Engineer's certificates relied upon by plaintiff are, under the provisions of the contract, final and conclusive as to the liability of the City for the claims asserted by the Contractor. It is generally held that parties competent to make contracts are competent to provide by contract that an Engineer shall in all cases decide every question which may arise relative to the fulfillment of the contract on the part of the Contractor and to agree that such decisions by the Engineer shall be binding upon the parties. In Kentucky and in almost every state similar contracts have been held enforceable in the absence of fraud or such gross mistake as necessarily implies fraud or bad faith. United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256; City of Covington v. Limerick, 40 S.W. 254, 19 Ky.Law Rep. 330, and Green River Steel Corp. v. Globe Erection Co., Ky., 294 S.W.2d 507, 511.

However, in respect to such decisions by the Engineer, the contract here involved provides "In doing so, to prevent disputes and litigation he shall render fair and impartial decisions". Thus, in addition to protection provided by applicable law on account of fraud or such gross mistake as necessarily implies fraud or bad faith, the City is also afforded protection against partiality or unfair action on the part of the Engineer in making decisions.

The certificates upon which Contractor relies as evidencing final completion of the five coordinated improvements covered by the contract were signed on behalf of LeFeber by Consulting Engineer Hugh A. Graff, who was not a member of the LeFeber firm but its employee as Consulting Engineer. His certificates as to the Water Mains, Storage Reservoir, Water Treatment Plant and Sewage Treatment Plant were transmitted to

the City with his letter of April 20, 1954, and as to Sewers and Pump Stations with his letter of July 13, 1954. It appears from Mr. Graff's certificates that he relied principally upon similar certificates of the Resident Engineer James W. Newman dated January 30, 1954, which were enclosed with the letters of transmission. He recommended that the City accept the improvements and pay the amounts shown by the so-called "final" estimates attached.

The City had been informed by Inspector Hemphill and Inspector Ohler, as well as by Mr. Wharton, as to numerous defects in the construction of sewers and the other improvements, the most serious of which related to the sewers, in that there was substantial infiltration of water and sand into the sewer pipes which obviously was the result of defective joints and other improper laying of the pipes. The City claimed that the tests for infiltration made prior to the certificates of Mr. Newman and Mr. Graff were not fair tests for the reason that they were made at an unusually dry period. The City insisted upon further tests. That these complaints of the City had substantial foundation is shown by the testimony introduced at the trial.

Mr. Thomas L. Sneed, General Manager of the Contractor, Bush Building Company, thus described the soil condition in the trenches encountered during construction in the vicinity of Short, Roosevelt and School Streets in Barbourville: "It was a conglomeration of blue gumbo mud, wet silt and very fine quicksand" (Tr. Vol. VI, p. 540), and further said "I notified Alfred LeFeber & Associates, through Mr. Graff, that we had encountered certain soil conditions that in our opinion were not suitable to construct a sewer thereon. We had a conference on the job." (Tr. Vol. VI, p. 546)

Several of the workmen, who were employed by the Contractor, testified as to water in the trenches and as to defective methods and means employed in laying the sewer pipes and sealing the joints. (Tr. Vol. VII, pp. 606–743)

Simple fairness to the City required that approval of the sewers should have been deferred until fair tests for excessive infiltration of water and sand into the sewers were made. In disregard of such considerations, as well as of the provisions of the Contract that "Defective work shall be made good * * * notwithstanding that such work and materials have been previously overlooked by the Engineer and accepted or estimated for payment", Mr. Newman and Mr. Graff nevertheless proceeded to make the certificates of approval.

In his overzealous effort to persuade the City to accept the sewers and place them in operation, by his letter of December 4, 1953 (Tr. Vol. V, pp. 422–422a), Mr. Graff went so far as to represent to the City that "the sewer pipe joints are practically water tight". The same appearance of favoritism toward the interest of the Contractor and lack of impartiality and good faith in respect to the interest of the City is reflected in the change of views of the Engineer as to the applicable standard governing maximum allowable leakage into the sewers. It appears that as the infiltration was found to increase, he raised the maximum of allowable leakage from 36,960 gallons per day (Tr. Vol. V., pp. 424, 424a) to 76,876 gallons per day (Tr. Vol. V, p. 446n), and then to the final figure of 117,600 gallons per day (Tr. Vol. IX, p. 977).

It is not surprising that the City doubted the good faith of the Engineer's recommendations that it accept the work as finally completed and put the sewer system in operation by connecting sewer lines with the private homes of the people of the City. Such action would probably have rendered it extremely difficult, if not practically impossible, to establish that excessive infiltration of water into the main sewer lines was the result of the Contractor's breach of contract in constructing the main lines. Moreover, the City was confronted with the provision of the contract that "the approval of the final estimate for work by the owner shall constitute acceptance of the completed work."

The evidence shows that Mr. Mace, a member of the LeFeber firm, finally recognizing the reasonableness and fairness of the position of the City, made what he referred to as "long period" tests for excessive infiltration, which demonstrated beyond question that infiltration was far in excess of the allowable maximum and emphasized the mistake which had been made in that respect. By his letter of April 1, 1955, he sent the results of this test to the Contractor saying: "It is requested that in accordance with the terms of the contract, with particular respect to 'Guaranty and Maintenance of Work', you make such repairs, renewals or replacements as are necessary to prevent ground water infiltration in excess of 1500 gallons per inch of diameter per mile per day as specified, which for the sewers installed totals 117,600 gallons per day." (Tr. Vol. IX, pp. 977–985–987)

The repairs, renewals or replacements so required were never made by the Contractor.

Mr. Mace, speaking for the LeFeber firm, made it clear in his testimony that LeFeber never finally accepted the sewer system and "never stated it was entirely satisfactory". (Tr. Vol. IX, p. 1003)

▮▮ Under the attendant facts and circumstances disclosed in the record, the conclusion seems to be inescapable that the certificates in reference to the completion of the sewer lines relied upon by the Contractor were made in violation of the Contract provision requiring that such decisions shall be fair and impartial and the evidence produced at the trial tends to show that they were the result of such gross mistake as to imply bad faith and, consequently, they are not binding upon the City. The City was justified in refusing to accept the work as completed and in refusing to pay the estimates submitted as final estimates.

▮ On May 20, 1955, an order was entered, by agreement of the parties, assigning this case for trial on October 3, 1955. On September 7, 1955, LeFeber wrote to the Contractor enclosing a statement of defects and deficiencies deemed necessary under the terms of the contract and specifications, and on September 15, 1955, employees of the Contractor appeared in Barbourville, but the City refused to permit them to proceed in performance of work under this belated order of the Engineer. The Contractor's proposal to begin compliance with the Engineer's order was within only eighteen days of the beginning of the trial of this case. Since the LeFeber directions to the Contractor of April 1, 1955, calling for repairs and replacements of sewer lines so far as necessary to reduce infiltration below the finally approved maximum of 117,000 gallons per day, the failure of the Contractor to take any steps to remedy the defects thus called to its attention indicated its abandonment of further performance, and gave rise to the cause of action for damages asserted in the City's counterclaim which was approaching trial.

In Ayer & Lord Tie Co. v. O. T. O'Bannon & Co., 164 Ky. 34, 41, 174 S.W. 783, 786, the Court said: " * * * an offer to perform made after the suit was filed was a mere offer to compromise. Evidence thereof should have been excluded, and the instructions dealing with that issue should not have been given."

In respect to the defects proposed to be remedied at this late date, Mr. Mace frankly testified as follows:

"Q. 244. Now would the repair of those items which would affect infiltration affect it to any appreciable degree? A. I don't believe it would be a great amount. It would affect it some, but not to any major degree." (Tr. Vol. IX, pp. 991–2)

In rejecting this eleventh hour offer of the Contractor to complete the contract, the City acted within its rights.

▮ The Contractor's claim that certain work, in the amount of $4,143.82, was for work in addition to that required under the contract documents is not sustained by the preponderance of the evidence nor is it supported by a certificate of the Engineer, as required by the contract. It is therefore denied.

The Third Party Complaint, filed by the City against LeFeber, charging fraud and fraudulent collusion, is denied for lack of sufficient evidence to support it. The law of Kentucky is in accord with the established rule that to sustain a charge of fraud the evidence must be cogent, unequivocal and sufficiently convincing to leave the mind well satisfied that the allegations are true. Commissioners of Sewerage v. Davis, 6 Cir., 88 F.2d 797, 802; Dennis v. Thompson, 240 Ky. 727, 736, 737, 43 S.W.2d 18.

By reason of facts hereinabove stated as to the defects and omissions on the part of the plaintiff, Bush Building Company, in the construction of the improvements under its contract with defendant, City of Barbourville, the plaintiff's claims against the City should be denied and upon its counterclaim the City is entitled to be awarded in damages the equivalent of that for which it contracted.

The defects and omissions are such that they may be remedied without destruction of any substantial part of the benefit which the property of the City has received by reason of the Contractor's work, and the equivalent to which the City is entitled is the cost of making the work conform to the contract. 9 Am.Jur. § 152, p. 89; Young v. Cumberland County Educational Society, 183 Ky. 625, 628, 210 S.W. 494, 6 A.L.R. 135; Hoskins v. Williamson, 228 Ky. 395, 396, 15 S.W.2d 242; Ward v. Qualls, 229 Ky. 662, 17 S.W.2d 739.

It appears from the testimony of Clyde P. Mason, an engineer employed by the City, that the cost of repairing the sewer lines in the so-called sand area, shown on the map filed as defendant's exhibit No. 42, would be $97,629.26 (See defendant's exhibit No. 92). Mr. L. Ryan Ringo, an engineer employed by the Contractor, testified at length as to the result of his examination of the sewers, saying: "I think there has been some mistakes along the line in not preparing the foundation on which to lay this pipe on stone. As to whose fault, I am not permitted and don't want to get into it; but from an engineering standpoint I think that is 90 per cent of your trouble." (See Vol. IV, p. 372) He estimated that the repairs needed on an area of approximately 750 feet on Short Street and another street would cost about $3800 (Vol. IV, p. 374).

Mr. Mace of the LeFeber firm estimates that the repairs necessary on Short Street would cost approximately $10,158, and that the repairs on the streets to bring them up to the contract would cost approximately $2500. (Vol. XVII, p. 2004)

It is noticed that these estimates of Mr. Mason, Mr. Ringo and Mr. Mace are limited to the area flowing into pump station No. 1. It appears from the record that the Contractor sought to collect from the City $3,696.37 for repairing a break in the sewer on Short Street between Roosevelt and Main Streets. (See Def.'s Ex. No. 26)

However, in reference to excessive leakage in the remaining large areas flowing to pump stations Nos. 2 and 3, the evidence shows excessive leakage in them also. Mr. Mace testified as follows in reference to this matter:

"Q. 52. Don't these pumping records indicate to you that there is leakage, excessive leakage, in those two areas, pump stations 2 and 3? A. The chart.

"Q. 54. I mean the chart. A. Our charts show that there is excessive leakage.

"Q. 55. And Mr. Mason's chart, which more or less agrees with yours, shows that some of that leakage comes from pump stations 2 and 3, doesn't it? A. That is correct." (Vol. XVII, pp. 2031–2032. See chart filed by Mason, Def. Ex. 90, and chart filed by Mace, Def. Ex. 95)

The evidence is convincing that at various places throughout the nine miles of sewer pipe constituting the system there is excessive infiltration and that it can only be remedied by repairing substantial leaks wherever they may be found.

After considering all the evidence in the record bearing upon the question, my conclusion is that the expense of repairing the sewer lines and streets and of making the repairs called for upon other facilities as listed by the Engineer in his report and accompanying letters of September 7, 1955 (plaintiff's exhibits Nos. 13, 13a and 13b) in order to give the City the equivalent of that to which it is entitled under the contract, is the sum of $150,000, and the City is entitled to an award of damages in that amount.

It appearing from the record that the City has in hand $95,653.95, the amount of the contract price remaining unpaid, which is now available for making the necessary repairs, that amount should be credited on the award leaving a balance in the sum of $54,347.05, for which judgment should be entered against the Contractor in favor of the City upon its counterclaim.

The plaintiff's Complaint and Substituted Complaint, as amended, should be dismissed.

Counsel for the City will prepare, serve and submit for entry judgment in conformity herewith.