McGOVNEY & McKEE, INC., Plaintiff,

v.

CITY OF BEREA, KENTUCKY, Defendant and Third-Party Plaintiff,

v.

UNITED STATES FIDELITY & GUARANTY CO., Third-Party Defendant.

Civ. A No. 2158.

United States District Court,
E. D. Kentucky,
Lexington Division.

March 20, 1978.

---

David T. Enlow, Murphy, King, Enlow & Dunn, Lexington, Ky., for McGovney & McKee, plaintiff.

James T. Gilbert, Duerson & Gilbert, Berea, Ky., for City of Berea, Ky., defendant and third-party plaintiff.

Frank G. Dickey, Jr., Landrum, Patterson & Dickey, Lexington, Ky., for U. S. Fidelity & Guaranty Co., third-party defendant.

## MEMORANDUM OPINION

SILER, District Judge.

After trial without a jury, the Court has made the following Findings of Facts and Conclusions of Law, pursuant to Rule 52, Fed.R.Civ.P. The case began on July 2, 1970, as a suit for declaratory relief, under 28 U.S.C. §§ 2201, 2202 by McGovney & McKee, Inc. (hereinafter "Contractor") against the City of Berea, Kentucky (hereinafter "Berea"), to determine if Berea was allowed to terminate the contract involved or if it was the duty of Berea to furnish drawings and specifications to Contractor to complete its contract. Berea filed a counterclaim demanding damages against Contractor for breach of contract in filing a third-party complaint against United States Fidelity & Guaranty Co. (hereinafter "Surety") as the surety on the construction contract. By the time this came to trial in 1976, the declaration of rights issue was subverted to the counterclaim and third-party claim, as Berea had hired another contractor, Nash & Stewart (hereinafter "N&S"), to finish the project. The Court does not know why it took so long for this case to be set for trial, but it is noted that Contractor's original counsel, Frank S. Ginoccio, is now dead, and the Judge to whom this case was originally assigned, Honorable Mac Swinford, died in 1975. It was subsequently assigned to Chief Judge Bernard T. Moynahan, Jr., and then to the undersigned Judge. In the meantime, between the fiscal years from the date the case was filed until the trial, the civil case load of this Court increased 179.5% (from 913 pending cases to 2926) without a commensurate increase in the number of Judges. (An additional Judge took office in 1972, but the position had been authorized in 1970.) Perhaps that, to some extent, was a contribu-

ting factor to the delay in arriving at a legal solution. An additional problem has arisen in this Court deciding this case once submitted. As it is a diversity case with no priority over criminal and certain other types of cases, it has lain on the docket for about one year from the date submitted. This illustrates the problems of handling diversity cases in federal courts. *Cf. Arrow-Hart, Inc. v. Philip Carey Co.*, 552 F.2d 711 (6th Cir. 1977). This is digressing from the essential facts and legal questions to be decided, but it was thought necessary to explain why there was such a delay in this matter. Had Contractor not chosen the federal forum, and had filed the matter in a state court, or had this Court been able to get to the case immediately, Contractor could have determined its rights before the contract was let to N&S, and much of this litigation could have been avoided.

## FINDINGS OF FACTS

Berea is a municipal corporation located in Madison County, Kentucky, and is a citizen of the Commonwealth of Kentucky. Contractor is a corporation incorporated in Ohio with its principal place of business in Portsmouth, Ohio, and is, therefore, a citizen of the State of Ohio. Surety is a corporation incorporated in the State of Maryland, with its principal place of business in Baltimore, Maryland, and is, therefore, a citizen of Maryland. The amount in controversy exceeds $10,000.00, exclusive of interest and costs.

Berea entered into a contract, which is the subject of this controversy, with Contractor for the construction of a sewage treatment plant. The work was to be done according to the plans and specifications provided by Theodore Strunk, an engineer, who died before this case came to trial. The project was bid according to law and Contractor was the low bidder to complete the project at an overall cost of $217,375.00. The contract was entered into on April 24, 1969, and work commenced on July 7, 1969, to be completed by September 11, 1970, or

else be subject to liquidated damages in the amount of $100.00 per day until the project was completed. Surety was on the performance bond, the terms of which will be discussed *post.*

During the construction period, after a concrete aeration tank eighty-eight feet in diameter had been poured and was sitting on the ground in place, there was an accumulation of ground or surface water in the area of the tank, causing it to float out of its original position and to lodge on a rock at a tilt. No one was at the job site when this occurred, but it was discovered sometime between December 29, 1969, and January 22, 1970. At that time, River City Construction Co., a subcontractor, whose superintendent was John Clifford, was doing this phase of the work for Contractor. As the water was rising just before the tank floated, Strunk had gone to the job site, and had told Clifford he could shut down the construction work because of bad weather. He further told Clifford that water was flowing into the aeration tank from another tank in the project and the water in the aeration tank was equalizing the pressure on the outside so that the tank would not float. The work was then shut down by Contractor. Shortly thereafter, Strunk told Clifford by telephone that the tank had floated and Clifford the following day went to the job site where he and Strunk took certain measurements on the elevation and alignment, preparatory to placing the tank back into its proper position. As the weather was too bad to allow work at the time, the actual movement of the tank was postponed until later when the weather cleared.

It was not until April, 1970, that Contractor took some action concerning the tank, when it dewatered the tank and cleaned up the debris in the vicinity. It was discovered that the tank was sitting on a rock ledge and the tank floor was damaged to the extent that it would have to be repoured. Several meetings were held in April and May, 1970, with Clifford, Strunk and Berea

officials in attendance to determine what steps to take to rectify the situation and to complete the contract. Contractor asserted it was ready, willing and able to complete the contract but desired advice from Strunk or Berea as to what it needed to do to complete the project, pursuant to section 3 of the contract, which provided:

The contractor will be furnished additional instructions and detailed drawings as necessary to carry out the work included in the contract.

In April, 1970, Berea accepted the work of Contractor as having been performed up to that time according to the contract. As no work had actually been done after the tank floated, it apparently was approval of the work up to December, 1969. However, in one of the meetings in May, Contractor presented to Berea a study made by another engineering firm, M&W Engineers, as to how the tank could be set back in place and the work continued. Contractor indicated a desire to complete the contract with additional plans and more compensation. Neither Berea nor Strunk gave any consent for Contractor to proceed under any different set of plans nor did either provide additional plans or specifications. Consequently, there was an impasse and no work was being done to complete the job.

Strunk subsequently notified Berea on June 24, 1970, that Contractor was in violation of its contract, and Berea on June 26, 1970, notified Contractor and Surety pursuant to section 23 of the contract that because of certain breaches of the contract, unless Contractor rectified the situation within ten days, the contract should terminate and Berea reserved the right to take over the work and complete it by another contract. Then, on July 2, 1970, Contractor brought this declaratory action to determine if Berea could terminate the contract.

Although Berea and its sewer commission never directed the contract to be terminated, on July 20, 1970, Berea's city council authorized the mayor and sewer commission to take the necessary steps to complete the project by "working with surety" and "by whatever means they deem necessary." Then, on July 23, 1970, by letter with a copy to Contractor, Berea notified Surety that the contract had terminated and Surety had the right to take over the work and commence performance within ten days from that date.

Surety took no action, so, on March 2, 1971, Berea signed the contract with N&S to complete the project under the same plans and specifications with certain agreed costs plus fifteen percent profit, not to exceed $17,000.00. The project was completed on October 1, 1971, for operation, although the aeration tank was still slightly off level, which did not affect its operation. The parking lot, required in the plans and specifications, was never completed.

Before Contractor ceased working on this project, it had been paid a total of $110,-774.44 for the work done up to that time, with the remainder of the $217,375.00 to be paid upon completion of the entire project. Berea paid or had estimates for expenditures in the amount of $191,223.70 to finish the project. It now asserts that Contractor owes it $84,593.14 as the difference between the contract price of $217,375.00 and the amount it cost or will eventually cost Berea to construct the project, $301,968.14 ($110,-744.44 plus $191,223.70). It has also demanded liquidated damages, as provided in the contract in the amount of $100.00 per day for three hundred eighty-five days between September 11, 1970, the date the project was due to have been completed, until October 1, 1971, the actual date of completion by N&S, or a total of $38,500.00 in liquidated damages.

The contract is rather extensive, and it is made a part of this record. Therefore, it would serve no useful purpose by this Court reiterating all the provisions in it. On the other hand, some essential portions of the contract are as follows:

Section 71 (in part):

The Contractor shall be responsible for all injury to work in process of construction,

and for all property or materials stored on the premises that may be damaged or stolen while the work is in his care, and he shall make good all such damages or loss without expense to the Owner, except as noted in Paragraph 13 of these General Conditions.

Section 12:

In the event of temporary suspension of work, or during inclement weather, or whenever the Architect/Engineer shall direct, the Contractor will, and will cause his subcontractors to protect carefully his and their work and materials against damage or injury from the weather. If, in the opinion of the Architect/Engineer, any work or materials shall have been damaged or injured by reason of failure on the part of the Contractor or any of his subcontractors to so protect his work, such materials shall be removed and replaced at the expense of the Contractor.

Section 13 (in part):

The Contractor shall replace or make good any such damage, loss or injury unless such be caused directly by errors contained in the contract or by the Owner, or his duly authorized representative.

■ An important factual issue to be decided here is whether the plans and specifications provided by Strunk for Berea were defective. For if they were, and if there was an implied warranty of fitness by Berea, according to Contractor, then there was no breach of contract, for the floating was caused by defective plans and specifications.

The plans and specifications were not defective. Although Strunk had not made calculations on the tank's floatation potential and there is a two-foot discrepancy between the ground water elevation shown on pages b–6 and b–7 of the plans, there is nothing to show that either had anything to do with the fact that the tank floated. It floated because the water exerted pressure on the outside of the tank, which pressure was not equalized on the inside of the tank. Had the Contractor installed a flap valve or left a hole in the side of the tank during construction (plugging it at the last minute before turning the project over to Berea), the tank would not have floated.

It was not the practice or custom for such valves or holes to be designed in this type of tank constructed in Kentucky, for it was the practice of contractors to protect the job by making sure these tanks remain in place during construction. There are other ways Contractor could have kept the tank from floating: filling the tank with water, constructing dams, or using pumps to minimize the water outside the tank. None was done. Thus, Contractor failed to carry out section 12 of the contract by protecting his work against injury from the weather. Therefore, there was a breach of contract or default here by Contractor when it failed or refused to complete the contract after the tank shifted. Berea, then, was justified in getting N&S to finish the work. Although Berea has suggested negligence in its brief, there is no proof of negligence in this case, on the part of Contractor.

■ When Berea gave the contract completion to N&S, it neither declared an emergency nor did it advertise for bids. However, there was a provision in section 23 of the contract to complete the project by "force account." The completion of the project by N&S in the manner as related is in accordance with the contract, and the project is now working in accordance with the way it was supposed to have worked.

The bond signed by Surety on this contract provided in part:

[I]n the event of any default on the part of said Principal in the performance of any of the terms, covenants or conditions of said contract, or in the event of any claim, demand, judgment, lien, cost or fee being obtained or made against the said Obligee, for or on account of the prosecution of the work as aforesaid, written notice thereof, with a statement of the principal facts showing such claim, demand, judgment, lien, cost or fee and the date thereof, shall within thirty days af-

ter the same shall have come to the notice of the said Obligee, be given to UNITED STATES FIDELITY AND GUARANTY COMPANY, at its office in the City of Baltimore, Maryland.

The first notice Surety had of the tank shifting and of the Contractor refusing to complete the contract was by letter dated June 26, 1970, to Contractor, indicating Berea's intention of terminating the contract. A copy was sent to Surety. If the breach or default occurred when the tank shifted in the winter, then Surety did not receive the notice called for in the bond. However, the breach or default did not occur until July 23, 1970, when Berea notified Contractor and Surety that the contract was terminated. Therefore, there was timely notification to Surety under the terms of the contract. Even had there not been, however, Surety was not prejudiced by not having been notified earlier of the default. In addition, the contract completed was not a material variation from the original contract, contrary to the position taken by Surety.

■ With regard to the damages, in the Conclusions of Law, the Court has found that Berea is not entitled to liquidated damages. However, it is entitled to the difference between the original contract price bid by the Contractor and the total completion cost, including the payments made to Contractor and all *reasonable* payments made to N&S and others *plus* any additional costs to complete portions of the original contract N&S did not complete. The only portion of the original contract N&S did not complete was the parking lot. Why it was not done is not clear, but maybe Berea ran out of money on the project. Nevertheless, it can recover it. Surety urges that as Berea kept $9,223.70 that was owed to Contractor, it should be deducted from the damages. That is fallacious reasoning for had Berea paid Contractor that figure, it would only add to the total cost of the project, as the expenses to complete the project were allegedly $191,223.70. All of these payments or amounts owed (in the case of the estimate on the completion of the parking area) were reasonable except where noted below.

■ Contractor suggests the charge of $1,365.00 under the contract to N&S for room and board per week for the superintendent was unreasonable as he did not stay at Berea during the work, but commuted to Lexington, his home, each day, a round trip distance of eighty miles. However, $35.00 per week comes to only about $7.00 per day, if work was done on five days per week, which appears to be the usual practice from the work records introduced into testimony, and is not unreasonable for food and mileage. Even at the rate of ten cents per mile, it would cost the superintendent $8.00 per day to travel between Lexington and Berea.

The charges for overtime, insurance, workmen's compensation and another performance bond were reasonable as valid costs for completion. Likewise were the equipment charges and built-in profit. One would not expect N&S to complete the project without some profit. The photographs were used by N&S to make its plans to reconstruct or refloat the tank and were necessary for the work.

■ The additional cost for replacement of the blowers is an expense that should never have arisen, as some of the blowers were on the job site but became damaged by the weather and ruined by rust. However, they were the property of Contractor or its subcontractor, River City Construction Co., so they had a duty to protect them. A real problem came up when some of Contractor's employees came back to the job site at some date after the floatation of the tank and Berea would not let them get to the equipment. It is unclear as to whether they came to protect or pick up the blowers, so one cannot speculate on that. At no time did Contractor write or contact Berea to get Berea to allow it to protect or pick up these blowers, so Berea had no duty to take independent action on property it did not own. Contractor could have saved itself a lot of money by protecting this equipment, but failed to do so. It has asserted that Berea did not mitigate damages by protecting this equipment, but Contrac-

tor was the party which failed to mitigate the damages. Therefore, it suffers because of its own inaction.

■ Finally, only a few items of damages claimed by Berea are questionable. One is the freight payment of $692.31 to Bronaugh Motor Express for delivery of something which was not made clear. There was no check to substantiate it nor explanation as to what it was for. The second is the cost of the flap valves. As the plans and specifications did not call for them, they were only needed to protect the property while under construction. Thus, the installation costs is reasonable. However, the cost of the valves themselves is not reasonable, for it is a deviation from the original plans and is an additional piece of equipment. Likewise, there are costs of $336.00 for changing the head house from the original plans, so these will be deleted from the damages.

Therefore, the damages are allocated as follows:

| | |
|---|---|
| Costs paid to N&S plus that necessary to complete | $191,223.70 |
| Less flap valve costs | −178.00 |
| Less payment to Bronaugh | −692.31 |
| Less additions to head house | −336.00 |
| Reasonable costs to complete project | $190,017.39 |
| Plus amount paid to Contractor | 110,744.44 |
| Total Construction Costs | $300,761.83 |
| Less original contract amount | $217,375.00 |
| Damages owed by Contractor | $ 83,386.83 |

## CONCLUSIONS OF LAW

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332. Kentucky law governs in this case, *Erie R. R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), as it involves diversity of citizenship.

■ The key to this case is whether there were defects in the plans and specifications. The Court has already found there were no defects. If the plans were defective, then, as in *Culbertson v. Ashland Cement & Construction Co.,* 144 Ky. 614, 139 S.W. 792 (1911), if the work is completed, Contractor is not liable for any damages due to those defects. The case at bar presents a slightly different situation, for here, even if the plans were defective for construction purposes, if the project was completed in accordance with those plans and specifications, there is no suggestion that the plant would not have operated properly.

This case is more like that in *Goin v. Board of Education,* 298 Ky. 645, 183 S.W.2d 819 (1944). In that case, there was an individual contract to complete a school building, with the contract providing that the contractor was to protect his work from damage. When a flood came and ruined part of the building, the contractor was bound to complete the project at no additional cost. Of course, there was no allegation of defective plans or specifications. Here, there is such an allegation, but there are no defects.

Moreover, where Contractor has failed to perform in accordance with the contract, then Berea is entitled to collect from Contractor the cost of making the work conform to the contract. See *Bush Bldg. Co. v. City of Barbourville,* 155 F.Supp. 394 (E.D. Ky.1957), *aff'd,* 266 F.2d 358 (6th Cir. 1959).

■ Contractor argues that by providing the plans and specifications, Berea has impliedly warranted their fitness. This is correct. *Cf. Culbertson v. Ashland Cement & Construction Co., supra.* However, as there were no defects, these plans and specifications were sufficient to construct the sewage plant. Admittedly, there were inaccurate estimates of ground water, but Contractor had the opportunity to look over the terrain and topography before the bids were let or construction begun. It was logical that as the project was a gravity flow sewage system, the tank would be located in a low area.

■ Surety asserts there is an estoppel here against Berea when Strunk certified Contractor's work in accordance with the contract up through March 31, 1970. Its argument is that Berea is thus precluded from stating that Contractor breached its

contract. However, the breach came later, and Contractor was required to finish the job in accordance with the plans and specifications, which it did not do. *Cf. Goin v. Board of Education, supra,* where the building was 90 percent complete before the damage occurred.

Its further arguments that Berea did not permit performance of the contract or prevented the performance are not valid. Surety argues that performance was frustrated and, therefore, the promisor (Contractor) here is discharged from the duty of performing his promise, *Restatement, Contracts* § 288. However, that has to do with frustration of the effect of the contract. A more applicable provision is *Restatement, Contracts* § 467:

> [F]acts existing when a bargain is made or occurring thereafter making performance of a promise more difficult or expensive than the parties anticipate, do not prevent a duty from arising or discharge a duty that has arisen.

This rule is followed in Kentucky, see, *e. g., Goin v. Board of Education, supra; Laurence E. Tierney Land Co. v. Kingston-Pocahontas Coal Co.,* 241 Ky. 101, 43 S.W.2d 517 (1931); and in the federal courts, see, *e. g., Banks Const. Co. v. United States,* 364 F.2d 357, 176 Ct.Cl. 1302 (1966). Thus, there is no frustration nor excuse for performance here.

Next, Contractor and Surety have raised the issue of whether the contract with N&S was illegal. Specifically, the minutes of Berea and its sewer commission do not reflect any authority to terminate the contract with Contractor. However, that was inherent in Berea's authorizing the mayor to take steps to complete the project. Perhaps a taxpayer or city official could raise the issue, but Contractor and Surety are not in such a position.

On the other hand, there is a serious issue as to whether the failure of Berea either to declare an emergency or to advertise for competitive bids invalidate the contract with N&S. Pursuant to KRS 424.260:

> Except where a statute specifically fixes a larger sum as the minimum for a requirement of advertisement for bids, no city, county or district, or board or commission of a city or county, may make a contract for materials, supplies or equipment, or for contractual services other than professional, involving an expenditure of more than one thousand dollars ($1,000) without first making newspaper advertisement for bids. Provided, however, that this requirement shall not apply in an emergency if the chief executive officer of such city, county or district has duly certified that an emergency exists, and has filed a copy of such certificate with the chief financial officer of such city, county, or district.

That figure was changed to $2500.00 by amendment in 1974, but the change is not material to this case. Needless to say, Berea did not follow the procedure set out in that statute. What is significant is whether the cases of *City of Hartford v. King,* 249 S.W.2d 13 (Ky.1952); and *City of Owensboro v. Evansville and Ohio Valley Transit Co.,* 448 S.W.2d 375 (Ky.1969), both involving predecessor statutes to KRS 424.260, mean that the contract with N&S was void. If so, then Berea may be able to claim nothing here for damages. In *City of Hartford v. King, supra,* it was held that the failure by the municipality to follow strictly the statute pertaining to bids on street improvements precluded the city from assessing property owners for the improvements. Further, in *City of Owensboro v. Evansville and Ohio Valley Transit Co., supra,* it was held that the statutory requirement for advertisement for bids is "jurisdictional" and "the city is without power to enter into a contract without such advertisement." *Id.* at 378.

Do Contractor and Surety have standing or a "legal interest" to contest this? At first blush, it appears that they do not. For instance, in *M. B. Guran Co., Inc. v. City of Akron,* 546 F.2d 201 (6th Cir. 1976), it was held that a violation by a municipality of HUD guidelines for competitive bidding did not give rise to an implied right of action against the municipality by an unsuccessful bidder. *Accord, Northland*

*Equities, Inc. v. Gateway Center Corp.,* 441 F.Supp. 259 (E.D.Pa., 1977) (no cause of action by unsuccessful bidder on GSA contract). But in *Association of Data Processing Service Organizations, Inc. v. Federal Home Loan Bank Board,* 568 F.2d 478 (6th Cir. 1977), it was held that data processing service businesses had a protected legal interest to bring suit to challenge the Federal Home Loan Bank Board and the Federal Home Loan Bank of Cincinnati from selling on-line data processing services to savings and loan associations. The test to determine this legal interest or standing is found in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975):

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," . . .—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? [Citations omitted.]

Thus, each case is to be decided on its individual facts, considering the criteria set out in *Cort v. Ash, supra.* Of course, some of the criteria apply to federal matters only. Moreover, such a legal interest may be different under Kentucky law to challenge the failure of a city to advertise for competitive bidding. In *City of Hartford v. King, supra,* property owners who had been assessed for street improvements had standing to challenge the assessments, and in *City of Owensboro v. Evansville and Ohio Transit Co., supra,* the municipality was allowed to repudiate its own contract. But in the latter case, the Court hinted that there might be others who could challenge a contract let without competitive bidding:

> We see no valid reason why the attack on the contract should have to come from a citizen or from an officer other than one who made the contract, because in any event it is the city's money that is being protected.

*Id.* at 379. The Kentucky Court of Appeals (now Supreme Court) still left unanswered whether another contractor could challenge the contract let by the city in a case such as this. Without a clear determination of Kentucky law, this Court must, therefore, decide what the Kentucky courts would hold in this situation. See *Tabben v. Ohio Casualty Ins. Co.,* 250 F.Supp. 853 (E.D.Ky. 1966). Under the circumstances of this case, this Court concludes that under Kentucky law, Contractor and Surety do not have a protected legal interest or standing to challenge the letting of the bid to N&S without complying with the statute. Moreover, under section 23 of the Contract, Berea could complete the project by force account, so Contractor is contractually bound by this method of completing the work.

In addition, even if the contract with N&S were void, nevertheless the element of damages could be computed from an estimate by experts, in this situation, N&S representatives, as to the cost of completion, just as was done here with regard to completion costs on the parking area. Contractor and Surety could have brought in experts to testify on the reasonable costs to complete the project, but they chose not to do so. Therefore, the Court considers that the payments to N&S are simply a means of computing damages and relied upon them in determining the damages.

Liquidated damages are not granted here even though they were provided for under the terms of the contract. Liquidated damages provisions in construction contracts are usually there to provide a means of ascertaining damages whenever it would be difficult to determine them otherwise. See *Gustav Hirsch Organization, Inc. v. East Kentucky R. E. C. C.,* 201 F.Supp. 809

(E.D.Ky.1962). This often comes up when a contractor has a completion date and runs past it, as was the situation at bar. But where the completion date is no longer within the power of the contractor to control and where the actual damages can be ascertained, as in this case, then recovery for liquidated damages in addition to actual damages is not allowable. *Cf. Robert F. Simmons & Associates v. Urban Renewal and Community Development Agency,* 497 S.W.2d 705 (Ky.1973).

Therefore, the motions by Contractor and Surety to dismiss will be overruled and judgment will be entered for Berea in the amount of $83,386.83 against Contractor and Surety, jointly and severally.