RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

REPUBLIC/NFR & C PARKING OF LOUISVILLE,
        *Plaintiff/Counter-Defendant-Appellee,*

v.

REGIONAL AIRPORT AUTHORITY OF LOUISVILLE AND
JEFFERSON COUNTY,
        *Defendant/Counter-Plaintiff-Appellant.*

No. 03-5433

>

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 01-00633—Charles R. Simpson, III, District Judge.

Argued: June 8, 2004

Decided and Filed: June 15, 2005

Before: BOGGS, Chief Judge; MOORE, Circuit Judge; and HOLSCHUH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Robert W. Griffith, STITES & HARBISON, Louisville, Kentucky, for Appellant. Deborah L. Varner, GEARHISER, PETERS, LOCKABY, CAVETT & ELLIOT, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** Robert W. Griffith, Bethany A. Breetz, STITES & HARBISON, Louisville, Kentucky, for Appellant. Deborah L. Varner, Robert Lockaby, Jr., Christopher T. Varner, GEARHISER, PETERS, LOCKABY, CAVETT & ELLIOT, Chattanooga, Tennessee, Frank P. Doheny, Jr., Kevin M. Norris, DINSMORE & SHOHL, Louisville, Kentucky, for Appellee.

---

## OPINION

---

BOGGS, Chief Judge. The Regional Airport Authority of Louisville (Airport Authority) appeals a grant of summary judgment to Republic/NFR & C Parking of Louisville (Republic) on its claim that it was allowed to terminate its airport parking concession due to financial losses in the wake of the terrorist attack on September 11, 2001. Because the district court erred in finding that security restrictions on parking implemented after the attacks constituted "damage" or "destruction"

---

[*] The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

to the premises that would release Republic from its contractual obligations, we vacate the grant of summary judgment in favor of Republic. None of the other arguments raised by Republic in defense to the Airport Authority's counterclaim for breach of contract is meritorious. We therefore remand to the district court with instructions to grant summary judgment in favor of the Airport Authority.

# I

In June 1999, after a public bidding process, Republic won a five-year contract that gave it the "right" and "obligation" to operate "premises" at the Louisville International Airport (SDF) that included the surface parking lot, garage, toll plaza, and the employee parking lot. In return, Republic agreed to pay the Airport Authority the greater of 1) a monthly minimum guarantee of 85% of the gross receipts from the same month of the previous year,[1] or 2) an amount equal to 93% of its actual gross receipts for that month. At the beginning of each month Republic paid the minimum guarantee, and it tendered any difference between that amount and the 93% figure at the end of that same month. The interest rate for late payment was 1.5% of the balance due.

The parties implemented the agreement smoothly until September 2001, when the attacks on the World Trade Center and Pentagon resulted in the Federal Aviation Authority (FAA) stopping commercial air travel for approximately three days. Afterwards, enhanced airport security restrictions meant that Republic could not use 810 parking spaces, 14.4% of the entire lot, until November 15th, when the FAA made the spaces available to anyone who was willing to undergo a vehicle search. Travel at SDF remained below 2000 levels until Republic terminated the contract in November 2001, although the 17% decrease in travel volume in October 2001 represented an improvement over the 33% deficit in September.

Under the terms of the contract, Republic owed the Airport Authority $1,101,000 on October 1, 2001 – the amount of the October minimum guarantee based on the gross receipts from October 2000. In a letter dated October 15, 2001, Republic stated that it was "not economically feasible" to pay the full amount because of its revenue losses from the September 11 attacks. The letter outlined a "relief provision," modeled on Republic's other contracts, because it was "fair and equitable . . . [that] we all share equally in the pain." Under its plan, Republic took the September 2001 guaranteed monthly figure as a base ($977,400) and reduced it by the projected October decline in revenue (22%). The "emergency plan" also guaranteed that Republic would cover its operating costs, including $2,500 for "management services," although Republic would pay the Airport Authority "all revenues in excess of the direct on-site operating costs." Finally, Republic computed that the Airport Authority should reimburse it for its September operational loss by allowing Republic to deduct approximately $73,000 from its guaranteed minimum for three months (October - December 2001). "Upon the belief" that the Airport Authority would find the "proposal acceptable," Republic remitted $689,641 instead of the $1,101,000 that the Airport Authority was owed under the terms of the original agreement. Republic did not invoke any provisions of the contract itself to justify this reduced payment.

On October 22, the Airport Authority responded that it could not legally accept Republic's compromise offer "due to the fact that the current minimum was bid under the franchise provisions of Kentucky's Constitution." The Airport Authority further informed Republic that it was in default of its payment obligations and that failure to make immediate payment "may result in termination of your concession and/or pursuit of other remedies the Authority may have."

Republic terminated the concession agreement on November 2, 2001, "pursuant to Section 19.1, and Subparagraphs B and D thereof, and Section 21.2," effective December 2, 2001. Section

---

[1]The contract stipulated the minimum amounts for the first year.

19.1B excused performance if the government took over the airport; Section 19.1D allowed termination if the parking facilities were damaged or destroyed; and Section 21.2 stated that a party could not be held responsible for breach caused by factors beyond its control. On the same day, Republic filed suit in the United States District Court for the Western District of Kentucky seeking a declaratory judgment that its failure to pay the full amounts in October and November was due to causes beyond its control, and therefore it was not in breach of its agreement with the Airport Authority.

On November 9, 2001, Republic sent the Airport Authority an additional payment of $215,862.36 for October, based on actual gross revenues of $1,044,356.93 and the deductions for revenue loss, operating expenses, and its September shortfall, as outlined above. The payment represented "100% of the revenue after deducting the actual on-site operating cost for October." Republic did not charge the Airport Authority the $2,500 management fee. Because its revenues were down 20.16% for the first six days of November, Republic reduced its minimum guarantee for November by that percentage; with the other two reductions for operating costs and the September loss, the estimated payment totaled $711,457, instead of $982,000 due under the original arrangement.

In a certified letter dated November 12, the Airport Authority demanded immediate full payment: an additional $193,373 to settle October; $270,743 more for the November minimum guarantee; and 1.5% interest on both payments from their respective due dates. The Airport Authority also informed Republic that it was "making alternative arrangements for the operation of the public and employee paid parking facilities at Louisville International Airport from and after December 2, 2001." On November 26, the Airport Authority filed a counter-claim against Republic for breach of contract, demanding full payment, compensatory damages, incidental damages, costs, and pre- and post-judgment interest. The parties then filed simultaneous cross-motions for summary judgment. On January 9, 2003, the district court granted Republic's motion, and denied the Airport Authority's cross-motion, for summary judgment. This appeal followed.

## II

This is a diversity case, governed by Kentucky law. We agree with the district court that the language of the Concession Agreement is unambiguous. We therefore enforce the agreement strictly according to its terms and assign the contract language in dispute its ordinary meaning, without considering extrinsic evidence. *Frear v. PTA Indust. Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). The district court granted summary judgment to Republic, a decision this panel reviews *de novo*. *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) (per curiam).

The district court found the language of Section 19.1D of the contract to be a plausible basis for termination. That provision allows Republic to end the agreement after 30 days in the event of:

> The damage or destruction of all or a material part of the Premises used or occupied by [Republic] hereunder that materially and adversely affects the ability of [Republic] to perform its obligations hereunder, or damage or destruction of all or a material part of the Airport or Airport facilities, including access to public roads, which is necessary to the operation of [Republic's] business, except to the extent and in the event such damage or destruction results from acts of negligence of [Republic].

Republic argued in the court below that the events of September 11 resulted in destruction or material damage to the parking lot at the Louisville airport because the ensuing security regulations deprived it of access to 810 prime parking spaces. In addition, FAA warnings about the

dangers of air travel and admonitions to travelers to take public transportation to the airport also constituted "damage" to the facility. Republic therefore concluded that it could terminate the contract.  The district court found that the dramatic decline in use of the airport after September 11 "resulted in a substantial loss of the value of the parking facilities," and concluded that "the parking facility at the airport was damaged in such a way that Republic was unable to perform as required by the agreement." It rejected the Airport Authority's argument that damage was limited to physical damage, not loss in value, and determined that Republic was entitled to terminate the contract and only pay a percentage of its actual receipts from September 11 to the day it terminated the contract.

However, a straightforward reading of the contract indicates that damage cannot be construed to mean simply loss of value.   Section 19.1D allows for termination in the event of "damage or destruction of all or a material part of the Premises used or occupied by the concessionaire . . . ." The cardinal rule of contract interpretation is that all words and phrases are to be given their ordinary meanings. *Fay E. Sams Money Purchase Pension Plan v. Jansen*, 3 S.W.3d 753, 757 (Ky. Ct. App. 1999).  The district court did not consider the meaning of the word destruction.  The dictionary defines it as "the act of destroying" or the "condition of having been destroyed." *American Heritage Dictionary* 493 (4th ed. 2000).  In turn, "destroy" is defined as "to ruin completely; spoil; . . . demolish . . . to render useless or ineffective." *Ibid.*

Even assuming, *arguendo*, that Republic is correct that the contract encompasses intangible destruction, we cannot see how a drop in revenue of 33% is the equivalent of being "ruined completely" or "rendered useless or ineffective."  Under Kentucky law, an intervening event must completely preclude performance before a contract may be rescinded, and this is a difficult standard to meet.  *Ky. Lumber & Millwork Co. v. George H. Rommell Co.*, 78 S.W.2d 52, 55 (Ky. 1934) (holding that the defendant contracted to furnish millwork to the plaintiff and the fact that its factory burned down did not excuse performance because the required items could be purchased from another mill); *cf. Juett v. Cincinnati, N. O. & T. P. R. Co.*, 53 S.W.2d 551 (Ky. 1932) (holding that the destruction of a railroad bridge absolved the original contractor from repair and maintenance obligations related to the structure).

Destruction does not have to be total.  *Roberts v. Comm. Cas. Ins. Co.*, 168 F.2d 23, 25 (6th Cir. 1948) (considering a hotel room destroyed by fire, although the rest of the building did not burn, because destruction is "harm that substantially affects . . . value, and does not necessarily mean complete demolishment") (citing Restatement of Torts, § 221).  However, no Kentucky court has construed the term in a purely figurative manner, as one must to include inaccessibility to parking spaces or loss of revenue in the definition of destroy.  Republic itself acknowledged that its interpretation is based on metaphor when it put the word destruction in quotation marks in its brief: "Thus, in addition to the 'destruction' of 14.4% of non-employee parking capacity at SDF, the impairment of the usefulness and value of [sic] the remaining parking capacity was damaged and continued to be damaged, as that term is commonly understood." Appellee Br. at 25.  We therefore hold that Republic was not entitled to terminate the contract under the "destruction" provision.

We now consider the common meaning of the word "damage" in the context of the contract in this case.  The district court began its analysis with a definition of damage from *Webster's II New Riverside University Dictionary*: "impairment of the usefulness or value of person or property." Other dictionaries offer a more expansive definition: "*Harm or injury* to property or a person, resulting in loss of value or the impairment of usefulness." *American Heritage Dictionary* 458 (4th ed. 2000); *Webster's New World Dictionary* 348 (3d ed. 1988) ("*injury or harm* to a person or thing, resulting in a loss in soundness or value") (emphases added).

The district court rejected the Airport Authority's contention that damage must be physical, pointing to the "many intangibles" that can be damaged, such as reputation and good will.  However, even the references to "damage" of intangibles imply some kind of harm to the thing or concept

itself that may not be easily remedied, if at all. The fact that intangibles can be damaged in a non-physical way does not entail that corporeal structures such as a parking garage can be damaged in an "intangible" way. The parking facilities at the Louisville airport were essentially the same on September 13, 2001, when commercial air travel resumed, as they had been on September 10th of that year. At worst, security regulations made 810 convenient parking spaces, 14.4% of the total, unavailable and discouraged an indeterminate number of other travelers from driving to the airport. Only a very strained interpretation of "damage" could lead to the conclusion that simply the imposition of government regulations designed to make air travel safer after September 11 constitutes a harm that damaged the parking premises, as Republic asserts in its brief. Appellee Br. at 5.

Furthermore, Republic has not alleged that the parking lot was filled to capacity at any time during the period leading up to its withdrawal from the contract, implying that Republic did not suffer any loss of necessary parking spaces due to security restrictions. Republic does not explain how it simultaneously could not function with a 14% reduction in parking spaces, yet was also entitled to terminate the agreement because of a significant decrease in customers that resulted in a 20-30% drop in revenues. Furthermore, there is no evidence in the record that Republic lost business specifically due to the requirement that some travelers had to walk an extra 300 feet, the distance between the terminal and the nearest parking space under the FAA restrictions.

Although the district court did not address the issue, it is worth noting that Republic must show that any damage extended to a "material part" of the parking facilities. Even if we were to accept Republic's interpretation of damage, it is hard to see how the loss of at most 14% of the available parking constitutes "a material part of the Premises used or occupied by [Republic]" and that the loss "materially and adversely affects the ability of [Republic] to perform its obligations hereunder." "Material part" generally means more than 14%. *Levinthal v. City of Covington*, 49 S.W.2d 574, 579 (Ky. 1932) (considering a "material part" of a bond fund to be "practically half of the remaining" assets).

For all of these reasons, we conclude that the district court erred in holding that the loss of 14% of the parking spaces at the Louisville airport from September 11, 2001 to November 15, 2001 constituted "damage or destruction of all or a material part of the Premises." It is hard to avoid the conclusion that Republic was searching for a way to get out of a contract that was no longer profitable. However, under Kentucky law, a decline in revenue or profit is not an acceptable basis on which to terminate a contract. *Kane v Hopkins*, 218 S.W.2d 37, 40 (Ky. 1949); *McGovney & McKee, Inc. v. City of Berea*, 448 F. Supp. 1049, 1057 (E.D. Ky. 1978).

## III

The district court stated in its memorandum opinion that "[t]he only circumstance relevant to this situation [Republic's termination of the contract] is found in ¶ 19.1D." We agree with the district court's apparent conclusion that none of the other provisions of the contract that allow a party to terminate the contract applies in this case. We therefore address only briefly some of the other arguments presented in Republic's brief.

Section 19.1B allows the contract to be terminated upon the "lawful assumption by the United States of America . . . of the operation, control or use of the Airport, or any substantial part or parts thereof . . . a period in excess of ninety (90) days." The FAA grounded all flights in U.S. air space after September 11, which arguably would constitute government assumption of airport operations; but this interference lasted three days, not ninety, so that Section 19.1B does not apply. Republic argues that blocking off access to 810 parking spaces "constituted an assumption of operation, control or use of a substantial part or parts of SDF . . . triggering application of Section 19.1B." Appellee Br. at 5. However, those spaces were available as of mid-November, albeit with

extra security regulations, so that even if we were to accept Republic's reading, the ninety-day threshold was not met, meaning that Section 19.1B still does not apply. Finally, government regulation that makes a venture less profitable than anticipated does not justify non-performance. *Frazer v. Collins*, 187 S.W.2d 816 (Ky. 1945).

Finally, Republic relies on Section 21.2 of the contract, which provides that a party shall not be considered in breach for "any failure to perform any of its obligations . . . due to any cause for which it is not responsible and over which it has no control." Republic asserts in its brief that "[t]he events of 9/11 and their after-effects constituted such a 'cause' that excused the Joint Venture's continued performance under the Agreement." Appellee Br. at 6, 57. This is a rhetorical sleight of hand. The terrorist attack of September 11, 2001 and the ensuing decline in air travel caused Republic's *unwillingness* to pay; its *failure* to pay was a straight-forward business decision. Nothing in the record suggests that the attack disrupted Republic's access to its bank or that it destroyed all Republic's assets so that it did not have the funds to pay the required monthly guarantee, the kind of direct link needed to show causation.

The Airport Authority gave up some of the revenue of its parking lot in exchange for guaranteed income equal to 85% of the parking revenues of the same month from the previous year. Appellant Br. at 4. Republic agreed to bear the risk of fluctuations in income. Had air travel increased, so would have Republic's profits, and the Airport Authority would not have been able to increase the percentage of its share because Republic was making more money than the parties envisioned. "When a contract is plain, unambiguous and fair, not vitiated by fraud nor mistake in its execution, the courts are not authorized to make for the parties to it a different one, or to construe it contrary to its express terms." *Johnson v. Edwards*, 20 S.W.2d 76, 77 (Ky. 1929) (citation omitted).

## IV

The district court erred when it concluded that "the parking facility was damaged in such a way as to prevent Republic from meeting its obligations under the agreement." We therefore **REVERSE** the grant of summary judgment to Republic, and **REMAND** with instructions to grant summary judgment for the Airport Authority.